UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**
JAN 18 2006
CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

JANNISS VARNER,

        Petitioner,

v.

        CIVIL CASE NO. 04-60210
        HON. MARIANNE O. BATTANI

CLARICE STOVALL, Warden,
Scott Correctional Facility,

        Respondent.
_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

### I.   INTRODUCTION

Petitioner Janniss Varner, through her attorney, has filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the Huron Valley Complex, in Ypsilanti, Michigan, challenges her 1999 conviction for assault with intent to commit murder. For the reasons set forth below, the Court denies the petition.

### II.   FACTS

Petitioner's conviction stems from the November 27, 1995, attempt to murder her boyfriend, Alvin Knight, through a hired third-party arrangement. Knight survived the charged attempt, but was subsequently shot to death on July 24, 1998. Following Knight's murder, police executed a warrantless search of his apartment at 23760 Fenkell in Detroit, and found Petitioner's journals. In those journals, Petitioner disclosed her responsibility for the attempt on Knight's life in 1995.

During Petitioner's trial, Oscar James Abney testified that he was Alvin Knight's cousin. Abney gave testimony that on the morning of November 27, 1995, Knight came to his house, told him that he had been shot and showed him the wound. Knight told Abney that he had been shot at Petitioner's mother's residence at 1603 Balmoral in Detroit, where Knight intended to pick up his young son. Abney testified that Knight explained to him what occurred as follows: when Knight arrived at the residence on Balmoral, he was told to go around to the back door. The door was open with a steel gate locked in front of it. Petitioner's mother told Knight that she had lost the key to the gate and slammed the door closed. A man came from behind Knight and started shooting. Knight grabbed the gun from the man, breaking the gunman's fingers, knocked him out with a bat, and attempted to hold him in the trunk of his car; however, the gunman woke up and ran away. Knight brought the gun to Abney's house and showed it to him. Abney testified that Knight told him that he did not go to the police because he knew Petitioner's mother had "connections." Abney called the police and EMS. Knight then relayed the events to the police and turned the gun over to an officer at Abney's house.

Officer Michael Foley testified that he went to Oscar Abney's house on the morning of November 27, 1995, in response to the police run. At the house, he observed Knight who had been shot in the shoulder. Officer Foley testified that Knight told him that he went to his girlfriend's house to pick up his child and his girlfriend's mother told him to go into the garage. When he went into the garage, someone came from behind and started shooting at him. A struggle ensued and Knight disarmed the gunman and ripped off his ski mask. Knight could not identify his assailant. Officer Foley testified that Knight gave the officers the gun, which was loaded with hollow bullets that do not eject casings when fired. Officer Foley further testified

that Knight told him he did not initially go to the police because his girlfriend's mother was highly influential and had connections within the police precinct.

Officer Peter Howard testified that he went to Petitioner's mother's home on November 27, 1995, to investigate the shooting. He found no evidence of blood or bullet casings at the scene.

Officer Karen Cooper testified that she lived on Fenkell in the same apartment complex as Knight. Officer Cooper gave testimony that near midnight on July 24, 1998, she saw Knight getting out of his car in front of the complex, exchanged greetings with him and proceeded to walk into the building when she heard gun shots. She returned to where Knight had been, and saw him on the ground with gunshot injuries. He died in her presence.

Sergeant Catherine Adams testified that she entered Knight's apartment on Fenkell on July 25, 1998, and on July 30, to look for clues in the homicide investigation. Sergeant Adams testified that during the second search, notebooks were seized from the front closet of the apartment, which were later identified as Petitioner's journals.

Sergeant Joann Kinney testified that she was the officer-in-charge of the homicide case involving the fatal shooting of Knight in 1998. Sergeant Kinney gave testimony that she received and read Petitioner's journals, seized from Knight's apartment, as well as additional journals later seized from the Balmoral address. The journals identified the gunman of the 1995 shooting to be Richard Toby Oliver. Sergeant Kinney testified that she located Oliver, who was living with Petitioner's relatives, and searched his medical records, that indicated he received treatment for hand injuries after the 1995 shooting.[1] Sergeant Kinney read numerous excerpts

---

[1] Oliver was prosecuted for the assault on Alvin Knight.

3

from Petitioner's journals, at times addressed "Dear God," attesting to Petitioner's involvement in the 1995 attempt to murder Knight. The journal entries revealed a volatile and physically abusive relationship between Petitioner and Alvin Knight, including rape and asphyxiation by Knight on November 25, 1995. Petitioner admits to having him shot, without regret, on November 27, 1995. She questions why he was not killed by Toby and expresses her wish that Knight had died in the garage. Petitioner indicates that Knight learned his lesson on November 27, 1995, and states that if he abuses her again, she will see to it that he dies.

Petitioner did not present any testimony and was convicted as charged.

### III. PROCEDURAL HISTORY

Following a jury trial in Wayne County Circuit Court, Petitioner was convicted of assault with intent to murder. On December 17, 1999, she was sentenced to imprisonment for 13 to 20 years on the conviction.

Petitioner filed a direct appeal in the Michigan Court of Appeals, presenting the following claims through counsel:

> I.  The defendant-appellant's private writings, seized without a warrant and crucial to the prosecution's case, were admitted in evidence in violation of her First and Fourth amendment rights.
>
> II. The defendant-appellant's right to present a defense was improperly curtailed by the trial court's orders foreclosing claims of self-defense and provocation, and excluding crucial expert testimony in regard to them.

The Michigan Court of Appeals affirmed Petitioner's conviction. People v. Varner, No. 224865, slip op., 2002 WL 741531 (Mich. Ct. App. Apr. 23, 2002). Petitioner then filed a delayed application for leave to appeal in the Michigan Supreme Court, raising the same claims presented to the Michigan Court of Appeals. The Michigan Supreme Court denied leave to

appeal. People v. Varner, 468 Mich. 884, 666 N.W.2d 672 (2003). Petitioner filed a petition for writ of *certiorari* in the United States Supreme Court, which was also denied. Varner v. Michigan, 540 U.S. 823 (2003).

Petitioner then filed the pending petition for writ of *habeas corpus*, presenting the following claims through counsel:

> I.   Petitioner's private writings addressed to God were privileged religious communications and should have been suppressed.
>
> II.  Petitioner's right to present a defense was improperly curtailed by the trial court's orders foreclosing claims of self-defense and provocation, and excluding crucial expert testimony in regard to them.
>
> III. The warrantless search of petitioner's residence was unlawful, and the federal court can consider the issue because the state court wrongfully ruled that she lacked standing, thereby depriving her of a ruling on the legality of the search.

### IV.   STANDARD OF REVIEW

Petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, codified in 28 U.S.C. § 2254. The AEDPA applies to all *habeas* petitions filed after the effective date of the act, April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 326 (1997).

The AEDPA imposes the following standard of review on federal courts reviewing applications for a writ of *habeas corpus*:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Franklin v. Francis, 144 F.3d 429 (6th Cir. 1998). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)[2]; See also Cremeans v. Chapleau, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous.").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for *habeas corpus* relief under the

---

[2] 28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

"unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." Id., at 409. The Court defined "unreasonable application" as follows:

> ... [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> ... [A]n unreasonable application of federal law is different from an incorrect application of federal law . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id., at 409-11.

With this standard in mind, the court proceeds to the merits of the petition for a writ of habeas corpus.

## V.   ANALYSIS

### A. Suppression of Evidence Claim

In her first claim for *habeas* relief, Petitioner alleges that her private writings are privileged religious communications that should have been suppressed. Petitioner argues that Michigan's penitential privilege statute violates her First Amendment rights by unlawfully favoring priest-based religions over other forms of religious practice.

> Michigan's statute providing a privilege for religious penitence states as follows:
>
> No minister of the gospel, or priest of any denomination whatsoever, or duly accredited Christian Science practitioner, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination.

MICH. COMP. LAWS ANN. § 600.2156.

Although not cited by Petitioner, a related statute provides, in relevant part, that:

> Any communications between . . . members of the clergy and the members of their respective churches . . . are hereby declared to be privileged and confidential when those communications were necessary to enable the . . . members of the clergy . . . to serve as such member of the clergy.

MICH. COMP. LAWS ANN. § 767.5a.

Petitioner admits that § 600.2156 does not, by its terms, apply to her private writings. Rather, she alleges that since the statute imposes no limitation on religious privilege, defining the limits of the statute is for the courts to resolve in a non-discriminatory manner.

Petitioner suggests that § 600.2156 should be extended by the Court to protect a "prayer-privilege," which she concedes is a novel legal contention. Petitioner attempts to characterize her writings as confessional "prayers to God," which merely "bypass the clergy," proffering a comparison between her private writings and privileged confessions to clergymen. Petitioner argues that by not protecting her writings, the statute violates the First Amendment by preferring religions that require intermediaries for confession over her practice of confessing, in writing, directly to God.

In denying Petitioner's motion to suppress the writings during the preliminary examination, the trial court found that Petitioner's writings were not protected, stating:

> It's creative, but for the purpose of this hearing, this Court believes that when a communication that might otherwise be privileged and confidential is reduced to writing, the expectation of confidentiality is affected in a manner that might be different than the confessional and spoken word.
>
> And so the Court finds that the argument, although interesting, is not supported by any Michigan case law and therefore, the argument of privilege, based upon some First Amendment argument, fails . . . .

People v. Varner, No. 98-11265 at pp. 157-158 (Wayne Co. Cir. Ct., Oct. 12, 1998).

The Michigan Court of Appeals affirmed the trial court's finding, stating:

> We also reject defendant's suggestion that the body of law regarding prayer and penitential privilege, or the statutes regarding privileged communications with clergy, MCL 600.2156 and MCL 767.5a, apply to private writings.

People v. Varner, 2002 WL 741531 at *2.

The Court finds that the Michigan Court of Appeals' decision, which incorporated the trial court's reasoning, is neither contrary to United States Supreme Court precedent nor an unreasonable application of federal law. Petitioner cites no authority for the proposition that Michigan's law regarding privileged religious communications applies to private writings. Moreover, Petitioner has not supported her assertion that the judiciary has broad discretion in extending the limits of penitential privileges to protect her private writings. Rather, the Supreme Court has emphasized the limited nature of privileges as follows:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that the public . . . has a right to every man's evidence and, as such, they must be strictly construed and accepted only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.

Trammel v. U.S., 445 U.S. 40 (1980) (citations omitted) (quoting U.S. v. Bryan, 339 U.S. 323 (1950) and Elkins v. U.S., 364 U.S. 206 (1960)).

Accordingly, the Court finds Petitioner has not established that admitting her private writings into evidence violated her First Amendment rights. Therefore, Petitioner is not entitled to relief on this claim.

### B. Right to Present a Defense Claim

In her second claim for *habeas* relief, Petitioner alleges that she was denied her right to present a defense when the trial court refused to instruct the jury on self defense and/or mitigating circumstances, and consequently precluded expert testimony offered to support those claims. Petitioner sought to present expert testimony regarding battered woman syndrome in an attempt to justify her actions as self defense or alternatively, to mitigate her charge of assault with intent to commit murder, based on provocation.

The right of a defendant to present a defense has long been recognized as "a fundamental element of due process of law." Washington v. State, 388 U.S. 14, 19 (1967). It is one of the "minimum essentials of a fair trial." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). The Supreme Court has described the "most basic ingredients of due process of law" as follows:

> A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense-- a right to his day in court -- are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

Washington v. Texas, 388 U.S. 14, 18 (1967) (quoting In re Oliver, 333 U.S. 257 (1948)).

Further, the Supreme Court described the right to present a defense as follows:

> The right to offer testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Id., at 19.

This Court recognizes that, while the right to present a defense is a fundamental tenet of due process, "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." U.S. v. Scheffer, 523 U.S. 303, 308 (1998). Indeed, "a defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interests in the criminal trial process." Id. (internal quotations omitted). However, the exclusion of evidence is unconstitutional where it "infringe [s] upon a weighty interest of the accused." Id. (citing Rock v. Arkansas, 483 U.S. 44, 58 (1987)); See also Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Washington v. Texas, 388 U.S. 14, 22-23 (1967).

In determining whether the exclusion of evidence infringes upon a weighty interest of the accused, the court's role is not to determine whether the excluded evidence would have caused the jury to reach a different result. Davis v. Alaska, 415 U.S. 308, 317 (1973). Instead, the question is whether the defendant was afforded "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).

In rejecting Petitioner's defense theories, initially raised in pretrial motions, the trial court held that such defenses were not permitted here because a third party was hired to commit the crime. Addressing the self defense claim, the trial court relied on People v. Yaklich, 833 P.2d 758 (Colo. Ct. App. 1991), where a self defense jury instruction was not permitted in a murder for hire situation. Noting that Michigan has not dealt with this situation in any decisions, the trial court adopted the reasoning in the Yaklich decision, indicating:

> It would be poor public policy to be established if the defendant were to escape punishment by virtue of an unprecedented application of self-defense while the

contract killer would be convicted for commission of the crime.

People v. Varner, No. 98-11265 at pp. 11 (Wayne Co. Cir. Ct., Nov. 5, 1999).

With respect to the provocation claim, the trial court held that contracting with a third party to commit the crime also precludes the mitigating circumstance instructions. The court found that the instruction has not been allowed in Michigan or in any other jurisdiction that the court is aware of, or that was provided by either party. People v. Varner, No. 98-11265 at pp. 15-17 (Wayne Co. Cir. Ct., Nov. 10, 1990).

The Michigan Court of Appeals held that the trial court was correct in rejecting Petitioner's claims, stating in relevant part:

> Defendant also argues that the trial court erred in denying her motion to present expert testimony on battered woman syndrome, and in refusing to instruct on self-defense and mitigating circumstances. Expert testimony regarding the battered woman syndrome is admissible only when it is relevant and helpful to the jury in evaluating a complainant's credibility and the expert witness is properly qualified. *People v. Christel*, 449 Mich 578, 579-580; 537 NW2d 194 (1995). Self-defense in Michigan requires a finding that the defendant's actions were justified because she honestly and reasonably believed that her life was in imminent danger or that there is a threat of serious bodily harm. *People v. Heflin*, 434 Mich 482, 502-503; 456 NW2d 10 (1990). A person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm, but self-defense is not available to repel a potential force. *Id.* We agree that the rationale behind self-defense or mitigating circumstances does not apply to a gun-for-hire situation such as occurred here. The trial court did not err in finding that a self-defense instruction was not available in a hired-gun situation, even if defendant presented credible evidence that she was a victim of the battered woman syndrome. See *People v. Yaklich*, 833 P2d 758 (Col App, 1992).

People v. Varner, 2002 WL 741531 at *2.

The Court finds that the Michigan Court of Appeals' decision, which affirmed the trial court's reasoning, is neither contrary to United States Supreme Court precedent nor an unreasonable application of federal law. Petitioner offers no case to support her contention that self defense and/or mitigating circumstances may be used in gun-for-hire situations. The state court did not deviate from any binding precedent in reaching its conclusion. Moreover, the state court was not unreasonable in rejecting Petitioner's defenses in light of the state law precedent precluding the use of self defense in gun-for-hire situations and the lack of case law permitting mitigating circumstances in such situations.

Thus, Petitioner has failed to establish that her right to present a defense was violated. Therefore, Petitioner is not entitled to relief on this claim.

### C. Unreasonable Search and Seizure Claim

In her final claim for *habeas* relief, Petitioner alleges that she was denied her Fourth Amendment right to be free from unreasonable search and seizure because the search of Knight's apartment, in which the police seized her journals, was executed without a warrant.

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal *habeas corpus* relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." Stone v. Powell, 428 U.S. 465, 494 (1976). The Sixth Circuit Court of Appeals utilizes a two-step analysis to determine whether a defendant was given a full and fair opportunity to litigate a Fourth Amendment claim in state court:

> First, the court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the

court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.

Machacek v. Hofbauer, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted).

Petitioner's Fourth Amendment claim was the subject of a suppression hearing in state court. Following the hearing, the trial court ruled that Petitioner had standing to challenge the search but based on the inevitable discovery rule, denied the motion to suppress. Petitioner then appealed her conviction to the Michigan Court of Appeals, again presenting her Fourth Amendment claim. The Michigan Court of Appeals addressed the claim in its opinion, reasoning that Petitioner did not have standing and therefore, found no Fourth Amendment violation. People v. Varner, No. 224865, slip op., 2002 WL 741531 (Mich. Ct. App. Apr. 23, 2002). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, once again presenting her Fourth Amendment claim. The Michigan Supreme Court denied leave to appeal. People v. Varner, 468 Mich. 884, 666 N.W.2d 672 (2003).

Petitioner argues that because the state court concluded that she lacked standing to assert a Fourth Amendment claim, she was not provided a full and fair opportunity to litigate her claim. Petitioner asserts that the failure of the appeals court to determine the legality of the search and seizure requires this Court to consider the issue. Petitioner relies on Gamble v. Oklahoma, 583 F.2d 1161, 1165 (10th Cir. 1978), where the court held:

> Opportunity for full and fair consideration includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim. . . . Furthermore it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards. Thus, a federal court is not precluded from considering a Fourth Amendment claims . . . where the state court wilfully refuses to apply the correct and controlling constitutional standards.

The Sixth Circuit has declined to adopt the portion of Gamble permitting federal review of egregious substantive errors committed by state courts on Fourth Amendment claims. Gilbert v. Park, 763 F.2d 821, 824 (6th Cir. 1985). The standard utilized by the Sixth Circuit in applying Stone limits this Court's analysis to the state's procedural mechanisms. Machacek v. Hofbauer, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted). Thus, Petitioner cites no binding authority for the proposition that an adverse decision regarding standing deprives a defendant of a full and fair opportunity to litigate a Fourth Amendment claim.

Petitioner also argues that when the appeals court overturned the trial court's ruling on standing, therefore, rejecting her Fourth Amendment claim, due process of the law was denied. Petitioner contends that since she did not appeal the matter of standing, she had no reason to believe that the matter of standing could be relitigated. Contrary to Petitioner's belief, the Supreme Court has held that the standing requirement is subsumed under substantive Fourth Amendment doctrine. Rakas v. Illinois, 439 U.S. 128, 139 (1978). Hence, when Petitioner appealed her Fourth Amendment claim, the issue of standing was included in that claim. "Any theoretical distinction between standing to raise a Fourth Amendment claim and the merits of that Fourth Amendment claim is illusory." Terry v. Martin, 120 F.3d 661, 664 (7th Cir. 1997) (citing Rakas v. Illinois, 439 U.S. 128, 138-40 (1978). Based on the foregoing, this Court concludes that Petitioner was provided an opportunity for full and fair litigation of her Fourth Amendment claim in the state courts. Consequently, this claim is not cognizable on *habeas* review.[3]

---

[3] Petitioner's final suggestion, that Stone v. Powell, 428 U.S. 465 (1976) be overruled if Petitioner's claim is barred from *Habeas Corpus* review has no merit and therefore, will not be addressed by this Court.

## IV.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Petitioner Janniss Varner's Petition for a Writ of *Habeas Corpus* is **DENIED**.

_____
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: **JAN 18 2006**

### CERTIFICATE OF SERVICE

Copies of this Order were mailed to James Sterling Lawrence and Janet A. Van Cleve on this date by ordinary mail and electronic filing.

_____
DEPUTY CLERK